UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KEVIN LAURY,

                    Plaintiff,                              Case No. 13-15059

v.                                               Paul D. Borman
                                               United States District Judge

MATTHEW RODRIGUEZ,
STEVEN CAMPBELL, BRIAN PRICE, AND
DAVID HUFFMAN,

                    Defendants.

_____/

OPINION AND ORDER GRANTING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 20)

       This civil rights case arises from the circumstances surrounding Plaintiff Kevin Laury's pretrial booking following his arrest for a traffic violation and possession of an ecstacy pill on April 25, 2013. On December 12, 2013, Plaintiff filed the instant one count complaint alleging "Violation of U.S.C.A. 4 - Excessive Force". (ECF. No. 1).

       Now before the Court is Defendants Matthew Rodriguez, Steven Campbell, Brian Price, and David Huffman's (collectively "Defendants") Motion for Summary Judgment that was filed on January 21, 2015. (ECF No. 20). Plaintiff Kevin Laury ("Plaintiff") responded on February 9, 2015. (ECF No. 25). Thereafter Defendants filed a reply. (ECF No. 27).

       A hearing on this matter was held on April 15, 2015. For the reasons set forth below, the Court GRANTS Defendants' Motion for Summary Judgment.

I. BACKGROUND

A.      Arrest of Plaintiff Laury

On April 25, 2013, Plaintiff Laury, then age 21, and his friend Devonte Campbell, then age

20, spent approximately three hours or so at Campbell's house in Grosse Pointe with two young

women they met online.  (ECF No. 20, Defs.' Mot., Ex. 1, Laury Dep. at 38-39; Ex. 2, D. Campbell

Dep. at 6, 22).[1]  During this time, Campbell admittedly consumed three ecstacy pills but testified that

"no one was drinking alcohol".  (Campbell Dep. at 20-21; Laury Dep. at 46).  After spending a few

hours together at Campbell's house, the women asked Plaintiff Laury and Campbell to drop them

at a bus stop.  (Laury Dep. at 40-41; Campbell Dep. at 22-23).

En route to the bus stop, at approximately 9:30 pm, Defendants Price and Huffman, City of

Warren Police Officers, observed Plaintiff Laury's 2009 Jaguar run a red light at 8 Mile near Hoover

in the city of Warren, Michigan.  (Laury Dep. at 41; Campbell Dep. at 23; Ex. 3, Price Dep. at 6; Ex.

5, In Car Dash Camera at approximately 21:31:37).  As a result, Defendants Price and Huffman

pulled over Plaintiff Laury's vehicle.  (Price Dep. at 6).  Defendant Price approached the driver side

window and spoke with Plaintiff Laury, and asked him if he and the passengers had been "drinking

a little bit".  (In Car Dash Camera, time: 21:32:21-43).  Plaintiff Laury's response to this question

is unclear from the dash camera video, but Defendant Price then stated that he saw a "red solo cup

in the back".  (*Id*. at 21:32:43).  Defendants Price and Huffman testified that car smelled of

intoxicants and that there was alcohol in the red solo cup in the backseat.  (Price Dep. at 9-10; Ex.

4, Huffman Dep. at 17).  Defendant Huffman testified that Plaintiff Laury admitted to drinking

[1] For ease of reference, unless otherwise noted all citations to exhibits will refer to the
exhibits attached to the Defendants' Motion for Summary Judgment (ECF No. 20).

alcohol and identified the red solo cup as containing alcohol. (Huffman Dep. at 17-18; Ex. 6, Arrest Report at 6-7). However, Plaintiff Laury disputed that he admitted to drinking. (Laury Dep. at 47). No sobriety tests were ever performed on Plaintiff Laury or Campbell.

Defendant Price then advised Plaintiff Laury that he ran a red light and asked for his identification. (*Id*. at 21:32:51- 21:33:25). At this point in the encounter, Defendant Price asked Plaintiff Laury to step out of the vehicle and conducted a pat-down search on Plaintiff Laury and asked him if he had any weapons. (Laury Dep. at 45). Plaintiff Laury responded that he did not. (*Id*.). During the search of Plaintiff Laury's person, Defendant Price found a single "Molly" pill (a slang term for Ecstacy, or MDMA) in Plaintiff Laury's pants pocket. (Laury Dep. at 47). Plaintiff Laury testified that he identified the pill as a "Molly" to Defendant Price and was handcuffed and put in to the back of the police car where he remained while Defendants Price and Huffman spoke with Campbell and the two women passengers. (Laury Dep. at 49-51).

After Plaintiff Laury was put in the back of the police car, Campbell, who was sitting in the front passenger seat, was directed to get out of the car, was searched, and was then handcuffed. After the search he was also put in the back of the police car. (Campbell Dep. at 26-28; In Car Dash Cam, at approximately 21:40:38). Campbell admitted to the officers that he was high on Molly and that the Molly found on Plaintiff Laury was actually his pill. (Laury Dep. at 50-52; Campbell Dep. at 22, 38). Campbell was also asked if there was alcohol in the car, to which he responded that there was none and "the only thing that was in the car is a cup with tobacco in it". (Campbell Dep. at 32:3-4). Campbell explained that he had been putting the ashes of his cigarette in the cup that was between the two women in backseat center console. (*Id*. at 32-33; Laury Dep. at 45-46).

3

Plaintiff Laury was arrested for possession of Ecstacy, reckless driving, and transporting an open liquor container. (Huffman Dep. at 11-12; Price Dep. at 11-12). Campbell was arrested for minor in possession of alcohol. (Huffman at 12-13; Price Dep. at 9-10). The two women in the backseat, both minors, were not arrested and were driven to the police station and allowed to call for a ride home. (Price Dep. at 10-11).

B.     In the Police Car

Plaintiff Laury and Campbell were handcuffed in the backseat of Defendant Price and Huffman's police car. It is undisputed that while in the back of the police car Plaintiff Laury was argumentative with Defendants Price and Huffman, repeatedly stating that he had not run a red light, claiming the arrest was "bullcrap", that he was "for sure" taking the matter to court, asking to see the video of him running a red light, and declaring that he had been pulled over as a result of racial profiling. (Ex. 5, Dash Camera (Rear) at 22:10-22:19; 22:27-34). Plaintiff Laury also stated that he was not drunk. (*Id*. at 22:19). Plaintiff Laury described his behavior in the car as such:

> I kept asking them why I were [sic] getting arrested. I basically was telling them I believe it was racial profiling, that I was muscled out of my car for no reason. There was no alcohol in the car. We argued pretty much on the arrest. Me and officer Price's partner, we had a discussion before [Defendant Price] got in the car while he was talking to the tow people that was towing the car. I asked him "Like why" – like why are you guys" ... Only thing I recall saying to Price was that he was mad – I told him he was mad that my car was worth more than he could afford or something like that.

(Laury Dep. at 56-57; *see also* Dash Camera (Rear) at 22:24 stating Defendant Price could not afford a car like his).

Defendant Price described Plaintiff Laury as "argumentative" and corroborated that Plaintiff Laury disputed that he had run a red light. (Price Dep. at 14). Defendant Huffman similarly described Defendant Laury's behavior and agreed when asked that he and Campbell were "running

their mouth too much" but noting that there was nothing "physical" that they were doing to cause any concern.  (Huffman Dep. at 14).

C.      Booking of Plaintiff Laury

Upon arrival at the Warren Police Department, Defendants Price and Huffman took Plaintiff Laury and Campbell into the elevator.  (Ex. 7, Elevator Camera).  The elevator stopped once on its way up to the booking and processing room and Defendant Huffman exited the elevator.[2]  (Huffman Dep. at 28; Laury Dep. at 60; *see also* Elevator Camera).  It is undisputed that Defendant Huffman had no other contact with Plaintiff Laury after exiting the elevator.  (Huffman Dep. at 29; Laury Dep. at 60-61).

Defendant Price continued with Plaintiff Laury and Campbell up to the booking and processing room.  (*See* Ex. 8, Booking Videos).  Plaintiff Laury testified that he was still "arguing" with Defendant Price while being escorted to booking telling Defendant Price that he felt that he had been racially profiled.  (Laury Dep. at 61).

In the booking area, Defendant Price directed Plaintiff Laury and Campbell, both still handcuffed with their hands behind their backs, to sit on the bench and asked them questions regarding their age and date of birth.  (Laury Dep. at 62-63; Booking Video NE at 10:42:02-10:42:48).  At this point, Plaintiff Laury told Defendant Price that his handcuffs were too tight "so I kept asking like 'Can you loosen the cuffs?  They're cutting my wrist.  They're cutting my writs.  They are hurting.'" (Laury Dep. 63:18-21).  Defendant Price ignored his requests and as a result

_____

[2] Two other officers who were not involved in the arrest of booking of Plaintiff Laury entered the elevator at the same time and exited with Defendant Huffman, leaving Defendant Price alone with Plaintiff Laury and Campbell for the rest of the short elevator ride.  (Elevator Camera; Huffman Dep. at 26-27).

5

Plaintiff Laury "began to stop, you know, complying to anything he asked me." (Laury Dep. at 63:25-64:1). Plaintiff Laury also testified that Defendant Price was "pick[ed] on him" by telling him that he would never see his car again, and insinuated that Plaintiff Laury had tried to rape the women passengers in his car. (*Id*. at 64). Plaintiff Laury admitted to telling Defendant Price, "Yeah, you a tough guy when I got these cuffs on." (*Id*. at 65:5-7).

During the booking process, Plaintiff Laury attempted to maneuver his handcuffs to the front of his body using a "jump rope action" with his arms because his wrists were in pain from the cuffs. (Laury Dep. at 65; Booking video NE at 10:42:48-10:43:00). In response to Plaintiff Laury's attempt to manipulate or get out of his handcuffs, Defendant Price walked over and held Plaintiff Laury by the throat to gain control over him.[3] (Booking Video NE at 10:43:00-10:43:05).

Some six or seven minutes after Plaintiff Laury attempted to maneuver his handcuffs to the front of his body, Defendant Price directed him to stand up and began to search his person. (Booking Video NE at 10:50:46). After that search, Defendant Price removed Plaintiff Laury's handcuffs and Plaintiff Laury began to turn around. (Booking Video NE at 10:54:30; Price Dep. at 27). Defendant Price testified that Plaintiff Laury did not follow his directions to place his hand on his head, so he moved Plaintiff Laury's arm behind his back to regain control of him. (Booking Video NE at 10:54:36- 10:55:02; Price Dep. at 27-28). Defendant Price then instructed Plaintiff Laury to sit back down on the bench. (Laury Dep. at 67).

Plaintiff Laury sat down on the bench (Booking Video NE at 10:55:12) and was then directed by Defendant Price to hand over his jacket without moving out of his seat. (Laury Dep. at 67). Plaintiff Laury then stood up, removed his jacket, and "flinged it at [Defendant Price]". (Laury Dep.

---

[3] Plaintiff Laury does not assert that this throat hold constituted excessive force.

6

at 67:15; Booking Video NE at 10:55:17).

Plaintiff Laury testified as to what happened next: "right after [Defendant Price] ran up on my side – on my right side, put his hands around my neck, started choking me against Devonte Campbell." (Laury Dep. at 67:8-12). Plaintiff Laury further explained:

> [h]e continues to choke me on the bench, and eventually he end up grabbing my hair and grabbing me and slamming me on the ground. Then when he gets me on the ground, and he bends my arms all the way back behind my back, puts his knee in my back, and I believe he puts his boot on the side of my head, pushed down on it.

(*Id*. at 71:14-21). Defendant Price described the events, similarly, in this manner:

> when I directed [Plaintiff Laury] to take his jacket off and he threw it in my face and I saw him beginning to bend down from my limited view that I had below the jacket, I believed that an assault was going to occur, whether he was going to head butt me across the room or attempt to drag me on top of him onto the bench. Even though Mr. Campbell is obviously handcuffed over there, he's still a threat because he's able to kick or anything else that he would be able to do.... So at which time I took control of [Plaintiff Laury].

(Price Dep. at 28-29). Defendant Price then used pressure points on Plaintiff Laury's neck (behind the ear and jaw) to gain control of him while holding him on the bench. (Price Dep. at 29; Booking Video NE at 10:55:24-35).

While Plaintiff Laury was being held on the bench by Defendant Price, Campbell moved off the bench to stand. (Laury Dep. at 75; Booking Video NE at 10:55:24). Defendant Price then moved Plaintiff Laury to the floor and on to his stomach where he knelt on Plaintiff Laury's back while pulling his arms behind him. (Price Dep. at 29; Booking Video NE at 10:55:32-50). Meanwhile, Defendant Campbell walked into the Booking room and moved Campbell away from Plaintiff Laury and Defendant Price. (Booking Video NE & NW at 10:55:26). A few seconds later, Defendant Rodriguez entered the Booking room and walked over to Defendant Campbell and Campbell. (Booking Video NE & NW at 10:55:34-36).

7

While Plaintiff was restrained on the ground by Defendant Price, but before handcuffs are administered, Defendant Rodriguez walked from the area where Defendant Campbell was with Campbell over to the area where Plaintiff Laury was being held on the ground by Defendant Price. (Booking Videos NE & NW at 10:55:49; Rodriguez Dep. at 26). Defendant Rodriguez then kneeled upon or near Plaintiff Laury's head while Defendant Price re-placed handcuffs on Plaintiff Laury. (Booking Video NW at 10:55:49-10:55:59; Rodriguez Dep. at 26).

Defendant Rodriguez then retrieved a restraint chair and brought it into the booking room. (Booking Video NE & NW at 10:56:12-31; Price Dep. at 32). Defendant Price remained kneeling on Plaintiff Laury's back, getting up once after he is handcuffed behind his back, then returning again. (Booking Video NE at 10:55:49-10:57:40). Meanwhile, Defendant Campbell left arrestee Campbell, who was sitting on the bench, and stood above Defendant Price while he remained kneeling on Plaintiff Laury's back. (Booking Video NE at 10:56:27-10:57:53). At this point, Defendant Price can be seen with his hands near or on Plaintiff Laury's head or neck, although it is unclear what he is doing. (Booking Video NW at 10:56:13-54).

Then, Defendant Campbell and Defendant Price lifted Plaintiff Laury up by his handcuffed arms and placed him in the restraint chair and then all three defendants, Campbell, Price and Rodriguez strapped Plaintiff Laury into the restraint chair. (Booking Video NE at 10:57:58-10:59:21; Laury Dep. at 77). Plaintiff Laury was then moved, while still in the chair, into the holding cell. (*Id*. at 10:59:25). Plaintiff Laury remained in the restraint chair for a few hours. (Laury Dep. at 79).

Plaintiff Laury testified that the officers told him "Welcome to Warren" and "You all know not to bring that shit over here on the other side of Eight Mile" and kicked or pushed the restraint

8

chair into the holding cell.  (Laury Dep. 72, 76).

    D. After the Altercation

    After the altercation, Plaintiff Laury testified that he was bleeding from his head and ear and requested that someone wipe his face of the blood, and also stated that he that he told the officers that "I told them that my head was spinning.  I couldn't breathe.  I also told them that my– I can't feel my hand.  My whole hand and my arm got numb, so I couldn't feel my, and I was asking them if they could loosen the restraints or something a little because my hand was numb."  (Laury Dep. at 82:14-19).  No one responded to Plaintiff's requests beyond an unknown officer who told Plaintiff Laury that if he wasn't quiet he would sit for longer in the restraint chair.  (*Id*. at 83).  At some point, Defendant Price walked up to Plaintiff Laury with a medical kit, looked at the cut on his head, stated "Oh, ain't nothing wrong with you", and then left.  (*Id*. at 83-84).

    Plaintiff Laury testified that he suffered a number of injuries as a result of the altercation on April 25, 2013, including, internal bleeding; scratches to his face; laceration to his ear because his earring was pulled out; swelling and bruising of his wrist, headaches, an exacerbation to pervious back injuries, soreness in his ankles, and nightmares.[4]  (Laury Dep. at 87-89, 95, 99, 100-01, 121-22).

    Plaintiff Laury was eventually charged with possession of the "Molly" pill, obstruction of a police officer, reckless driving, and driving with an open intoxicant in the car.  (Laury Dep. at 91; Ex. 12, Felony Complaint).  Plaintiff Laury pleaded guilty to possessing the ecstacy pill and the other charges were dismissed by the prosecutor.  (*Id*. at 92).  Plaintiff Laury was sentenced to

---

    [4] Plaintiff Laury cites to exhibits attached to his deposition in support of these injuries however he failed to attach these exhibits to his Response.

probation for a term of one year, which he completed early.  (*Id*. at 92-92).

## II. STANDARD OF REVIEW

Defendant has moved for summary judgment under Rule 56(a) of the Federal Rules of Civil Procedure.  This rule provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of genuine issue of material fact."  *Id*. at 323; *see also Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).  However, in making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party.  *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984).  Where a non-moving party's version of the events is silent or "blatantly contradicted" by recordings, however, the court must rely upon those recordings.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007); *Coble v. City of Whitehouse, Tenn*., 634 F.3d 865, 868 (6th Cir. 2011).

## III. ANALYSIS

A.    Plaintiff's Claims and Applicable Standards

In order to make a claim pursuant to 42 U.S.C. § 1983, a plaintiff must establish a violation

10

of an existing constitutional right by a person acting under color of state law.[5]  *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155 (1978); *Waters v. City of Morristown*, 242 F.3d 353, 358-59 (6th Cir. 2001).  Section 1983, however, does not confer any substantive rights but rather affords a means to "vindicate rights conferred by the Constitution or laws of the United States." *Aldini v. Johnson*, 609 F.3d 858, 864 (6th Cir. 2010).  Thus, "[i]n addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 394 (1989)).

The parties appear to agree that Plaintiff Laury's claims regarding Defendants' use of excessive force during his booking procedure are governed by the Fourth Amendment.  However, despite only setting forth a claim pursuant to the Fourth Amendment in his Complaint, Plaintiff Laury makes references to the Fourteenth Amendment in his Response brief.  (Pl.'s Resp. at 22-23).  To the extent that Plaintiff Laury could be attempting to assert a Fourteenth Amendment claim for excessive force, such a claim fails.  It is well settled that the Fourth Amendment's protections extend through the booking process.[6]  *See Aldini*, 609 F.3d at 867 (holding that the "dividing line between the Fourth and Fourteenth Amendment zones of protection" is set at the probable cause hearing and therefore, a beating and tasing that took place "in the middle of the booking procedure" was

---

[5] In the present case, it is undisputed that the Defendants were operating under the color of state law.  Therefore, the Court's inquiry only addresses whether an actionable constitutional violation occurred.

[6] Further, it appears from the briefing that the Defendants agree with the application of the Fourth Amendment standard which is more favorable (to Plaintiff).  *See Aldini*, 609 F.3d at 867 (noting that conduct that would violate the Fourteenth Amendment would establish a Fourth Amendment violation.); *see Darrah v. City of Oak Park*, 255 F.3d 301, 306 (6th Cir. 2001) ("A substantially higher hurdle must be surpassed to make a showing of excessive force under the Fourteenth Amendment['s 'shock-the-conscience' standard] than under the 'objective reasonableness' test of [the Fourth Amendment] ...").

governed by the Fourth Amendment.).  Indeed, the Sixth Circuit has explained that "[t]he Fourth Amendment of the United States Constitution protects a person from being subjected to excessive physical force during the course of an arrest, a booking, or other police seizure." *Malory v. Whiting*, 489 F. App'x. 78, 81 (6th Cir. 2012) (citing *Drogosch v. Metcalf*, 557 F.3d 372, 378 (6th Cir. 2009)).

As the Sixth Circuit set forth in *Burgess v. Fischer*, 735 F.3d 462 (6th Cir. 2013), to make a showing of excessive force "[u]nder the Fourth Amendment, [courts] apply an objective reasonableness test, looking to the reasonableness of the force in light of the totality of the circumstances confronting the defendants, and not to the underlying intent or motivation of the defendants." *Id*., at 472, citing *Dunigan v. Noble*, 390 F.3d 486, 493 (6th Cir. 2004); *see also Graham*, 490 U.S. at 396-97.  Three factors guide the Court's analysis in this inquiry: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Martin v. City of Broadview Heights*, 712 F.3d 951, 958 (6th Cir. 2013) (citing *St. John v. Hickey*, 411 F.3d 762, 771 (6th Cir. 2005); *see Graham*, 490 U.S. at 396).  This inquiry must also be "assessed from the perspective of a reasonable officer on the scene making a split-second judgment under tense, uncertain, and rapidly evolving circumstances without the advantage of 20/20 hindsight." *Burgess*, at 473 (citing *Graham*, 490 U.S. at 396-97); *accord Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002).  Moreover, a court must balance "the nature and quality of the intrusion on [a plaintiff's] Fourth Amendment interests against the countervailing governmental interests at stake." *Ciminillo v. Streicher*, 434 F.3d 461, 466-67 (6th Cir. 2006).

12

Defendants argue that regardless of whether Plaintiff Laury's constitutional rights were violated during the booking procedure, they are entitled to qualified immunity.  The doctrine of qualified immunity generally protects "government officials performing discretionary functions ... from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The purpose of qualified immunity is to "shield the official from suit altogether, saving him or her from the burdens of discovery and costs of trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  This doctrine protects government officials from civil liability unless, "in the course of performing their discretionary functions, they violate the plaintiff's clearly established constitutional rights." *Jones v. Byrnes*, 585 F.3d 971, 974 (6th Cir. 2009).

A government official is entitled to qualified immunity "unless a plaintiff pleads facts showing: "(1) that the official violated a statutory or constitutional right and (2) that the right was 'clearly established' at the time of the challenged conduct."[7] *Ashcroft v. al-Kidd*, --- U.S. --- , 131 S. Ct. 2074, 2080 (2011) (citation omitted).  The order of the inquiry is no longer mandatory and courts are allowed to use their discretion in deciding which of the two steps of the qualified immunity analysis should be addressed first.  *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).  Once a government official has raised the defense of qualified immunity, the plaintiff must bear the burden to demonstrate that the defense is unwarranted.  *Roth v. Guzman*, 650 F.3d 603, 609

---

[7] Some Sixth Circuit panels have also used a "third step requiring the court to determine whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established right." *Grawey v. Drury*, 567 F.3d 302, 309 (6th Cir. 2009) (citations omitted).  However, the Sixth Circuit has recognized that the third step is redundant in excessive force cases because "the defendant's conduct must have been unreasonable to find a constitutional violation" and therefore the two-step analysis should be employed.  *Id.*

13

(6th Cir. 2007). A constitutional right is clearly established when "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). "But under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, --- U.S. ---, 134 S. Ct. 1861, 1866 (2014).

Where more than one officer is alleged to have violated a plaintiff's Fourth Amendment rights, each officer's conduct must be analyzed separately. *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010) ("Each defendant's liability must be assessed individually based on his own actions.") (citation omitted). "To hold an officer liable for the use of excessive force, a plaintiff must prove that the officer '(1) actively participated in the use of excessive force, (2) supervised the officer who used excessive force, or (3) owed the victim a duty of protection against the use of excessive force.'" *Id.* (quoting *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)). The Sixth Circuit has stated that generally, an officer's mere presence during an altercation "without a showing of some responsibility, cannot suffice to subject them to liability." *Burgess*, 735 F.3d at 475.

B.     Constitutional Violations

"A reviewing court analyzes the subject event in segments when assessing the reasonableness of a police officer's actions." *Morrison v. Board of Trustees of Green Twp.*, 583 F.3d 394, 401 (6th Cir. 2009) (citing *Phelps v. Coy*, 286 F.3d 295, 301 (6th Cir. 2002). The Court finds that the relevant and logical segments giving rise to Plaintiff Laury's claims of excessive force are (1) the take down of Plaintiff Laury after he throws his jacket until he is put in the restraint chair and (2) use of the restraint chair. The Court also addresses the possibility that Plaintiff Laury has raised an excessive force claim based on "too tight" handcuffing prior to the jacket throwing incident and whether Plaintiff Laury is attempting to raise a denial of medical care claim pursuant to the

Fourteenth Amendment.

      1.    <u>Defendant Price's involvement in the Take Down of Plaintiff Laury</u>

As stated *supra*, this Court must use an objective reasonableness standard to assess whether excessive force was utilized during the altercation after Plaintiff Laury threw a jacket into Defendant Price's face until he was placed into the restraint chair. "This entails a fact-specific inquiry which balances the costs to the individual against the government's interest in using force. As evident from this formulation, a primary consideration in the inquiry is whether the law enforcement officer had a legitimate government interest, i.e. justification, to exert force." *Morrison*, 583 F.3d at 404 (citation omitted). Three factors guide the Court's analysis: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Martin*, 712 F.3d at 958 (citation omitted). Further, "the extent of the injury inflicted is not crucial to an analysis of a claim for excessive force in violation of the Fourth Amendment" but rather whether "[g]ratutious violence" was inflicted by the officer. *Morrison*, 583 F.3d at 407 (internal quotation marks and citations omitted).

The Court notes that Plaintiff Laury's underlying crimes consist of reckless driving, driving with an open intoxicant, and possession of an ecstacy pill; not inherently violent crimes. However, Plaintiff Laury was in possession of an illicit drug and his passenger, Campbell, admitted he was on drugs when their car was pulled over for driving recklessly. Defendants also contend that there was evidence that Plaintiff Laury had been drinking alcohol as well. While Plaintiff Laury disputes that he was drinking that night, the fact he was in possession of a drug, and his passenger admitted to being on drugs, could reasonably lead an officer to believe that both Plaintiff Laury and Campbell

might be under the influence of drugs and be inclined to act irrationally or erratically. *See e.g. Marvin v. City of Taylor*, 509 F.3d 234, 245-46 (6th Cir. 2008) (recognizing that "at first blush" a 78 year-old man did not appear to pose much of a threat to three officers, but finding the man's "heavy intoxication created a volatile situation".).

The Court further notes that it is undisputed that Plaintiff Laury had attempted to manipulate his handcuffs to the front of his body some ten minutes before the altercation with Defendant Price. Finally and significantly, Plaintiff Laury deliberately threw his coat into Defendant Price's face and obscured his vision. (Booking Video NW at 10:55:17). This act can reasonably be believed to signal the beginning of an assault or an escape attempt. Moreover, Defendant Price was the lone officer in the booking room with the two arrestees, one (Laury) uncuffed, at the time his vision was obscured by Plaintiff Laury's deliberately thrown jacket. These circumstances are compounded by the fact that Plaintiff Laury admittedly threatened Defendant Price, telling him: "Yeah, you a tough guy when I got these cuffs on" and was generally verbally agressive and argumentative, in addition to his physically aggressive act.

Given these undisputed facts, admitted to by Plaintiff Laury <u>and</u> depicted on the booking videos, Defendants Price's use of force in physically subduing Plaintiff Laury after the jacket toss was objectively reasonable. The Sixth Circuit has acknowledged that the reasonableness inquiry "must be conducted with sufficient respect for the fact that police officers often confront exceedingly perilous situations where detached rumination risks loss of life." *Kijowski v. City of Niles*, 372 F. App'x 595, 599 (6th Cir. 2010) (citing *Graham*, 490 U.S. at 396-97). Further, in *Abdul-Khaliq v. City of Newark*, 275 F. App'x 517, 521 (6th Cir. 2008) the Sixth Circuit found there was no genuine issue of material fact regarding the reasonableness of an officer's use pepper stray

on the plaintiff when that plaintiff admitted to "angry yelling and cursing at the officers" and "vigorously opening his coat in a gesture toward the police officers." Similarly, here, Plaintiff has admitted to arguing with the officers, attempting to manipulate his handcuffs, telling Defendant Price that he was only acting "tough" because Plaintiff was handcuffed, and throwing a coat into Defendant Price's face. *See also Lee v. Hill*, No. 12-10486, 2013 WL 5179059, at *5-6 (E.D. Mich. Sept. 12, 2013) (district court held the force used was reasonable when the plaintiff was physically subdued by defendant deputies after he shouted profanities at the defendants, reacted violently to an attempt to guide him to the strip search area, and thereafter threw his shoes at a deputy and dislodged the deputy's glasses.)

The Court finds these facts clearly depict a situation in which Defendant Price was faced with an uncuffed, possibly intoxicated and/or drugged, arrestee who was verbally aggressive, had recently attempted to manipulate his handcuffs, and had deliberately thrown his jacket in Defendant Price's face and obscured his vision. Under these circumstances, it was reasonable for Defendant Price to believe that an attack (or escape attempt) by Plaintiff Laury was imminent, and to respond by physically subduing him in order to regain control of him. Accordingly, the Court finds, just like the Sixth Circuit in *Abdul-Kaliq* and *Lee*, that subduing a detainee in the face of a possible further assault is reasonable, and summary judgment is appropriate as to Defendant Price that claim.

2.   Defendant Rodriguez's involvement in the Take Down of Plaintiff Laury

Plaintiff Laury claimed in his Response brief that the force used by an officer who kneeled or put his foot upon his head during the altercation constituted excessive force. (Resp. at 1, 7-8). Plaintiff Laury also testified that an unknown officer "put[] his boot on the side of my head, pushed it down" while Defendant Price was attempting to put him in handcuffs. (Laury Dep. at 71).

17

Defendants mistakenly claim throughout their briefing that it was Defendant Campbell who assisted Defendant Price in bringing Plaintiff Laury under control after the jacket toss. (Def.'s Br. at 6). Defendants further seek summary judgment for "Defendant Campbell" based on his involvement in the altercation after the jacket toss. (Def.'s Br. at 15-16). However, it is clear from the video evidence and testimony that Defendants are instead referring to Defendant Rodriguez, not Defendant Campbell, who was the officer that approached Plaintiff Laury while he was on the ground beneath Defendant Price and appeared to kneel on or crouch above his head. (Booking Video NE & NW at 10:55:48-10:56:10; Rodriguez Dep. at 26 (stating that at 10:55 of the booking video he is depicted assisting Defendant Price with Plaintiff Laury while Defendant Campbell remained with Campbell); *see also* Compl. at ¶ 23, identifying Defendant Rodriguez as the officer who "assisted Price in the continued beating and torture of Kevin Laury.")

Plaintiff Laury failed to address Defendants' arguments regarding the actions of the officer who assisted Defendant Price after the jacket toss. Indeed, Plaintiff Laury's Response brief does not differentiate the actions of *any* officer beyond the actions of Defendant Price. The law is clear that each officer's conduct must be individually assessed regarding qualified immunity. *Binay*, 601 F.3d at 650. Therefore, where Plaintiff Laury has failed to individually address or even identify the actions of Defendant Rodriguez when such actions are clearly depicted in video recordings and identified in a deposition, qualified immunity is appropriate.

Alternatively, even if Plaintiff Laury had set forth an argument based upon Defendant Rodriguez's actions, the Court finds that the Booking videos clearly reveal that Defendant Price was still attempting to handcuff Plaintiff Laury and bring him under control when Defendant Rodriguez approached and either crouched near or kneeled upon Plaintiff Laury's head. It is also undisputed

18

that Defendant Price placed handcuffs on Plaintiff Laury only *after* Defendant Rodriguez helped in restraining Plaintiff Laury. Therefore, the video shows that Plaintiff Laury was not yet incapacitated or handcuffed at the time Defendant Rodriguez assisted Defendant Price in securing handcuffs on Plaintiff Laury. Plaintiff Laury has not disputed this fact. Accordingly, the Court finds that the force used by Defendant Rodriguez was reasonable where he was assisting Defendant Price in gaining control over Plaintiff Laury.

3. <u>Defendant Rodriguez, Defendant Campbell and Defendant Price's use of the Restraint Chair</u>

Plaintiff Laury also submits that "improperly placing him in a restraint chair for several hours" amounted to excessive force. (Pl.'s Resp. at 1). Defendants Price, Campbell, and Rodriguez all participated in strapping Plaintiff Laury to the restraint chair after he was handcuffed. Defendants argue that Plaintiff Laury's constitutional claim regarding the restraint chair should be denied and rely upon the Fourteenth and then later the Eighth Amendment standard for this argument.

The Court notes, however, at the time Plaintiff Laury was placed in the restraint chair he was in the middle of the booking process and had not yet had his probable cause hearing. Therefore, pursuant to the binding precedent in *Aldini*, Plaintiff Laury's claim regarding the use of excessive force during this time period should be properly analyzed under the Fourth Amendment standard. *See Crace v. Efaw*, 2011 WL 1459357 (S.D. Ohio Apr. 15, 2011) (denying summary judgment on excessive force claim based in part on use of restraint chair during booking process applying the Fourth Amendment standard, relying upon *Aldini*); *see also Berishaj v. City of Warren*, 2006 WL 2069440, at *12-14 (E.D. Mich. Jul. 26, 2006) (Roberts, J) (pre-*Aldini*, recognizing that the law in 2006 was unsettled as to "when an arrestee becomes a pretrial detainee protected by the Fourteenth,

19

rather than the Fourth Amendment" where plaintiff alleged excessive force based on use of a restraint chair during the booking process, but declining to reach issue when a genuine issue of material fact existed under either standard).[8]  The Court finds that in light of *Aldini v. Johnson*, 609 F.3d 858, 864 (6th Cir. 2010), Plaintiff Laury's claim that the use of the restraint chair constituted excessive force and should be analyzed under the Fourth Amendment "objective reasonableness" standard.[9]

Defendants argue that the "restraint chair was used when Laury continued to be verbally aggressive after assaulting a police officer, a take-down by force and being handcuffed.  It is undisputed that Officers Price and S. Campbell threatened and then used the restraint chair only to gain Laury's compliance...."  (Defs.' Mot. at 17).  Plaintiff Laury has failed to articulate *any* argument in response to Defendants' arguments regarding his claims based on the use of the restraint chair.  Rather, Plaintiff Laury's framed his excessive force claim as encompassing only the physical

---

[8] The Court notes that Defendants also cite 42 U.S.C. § 1997e(e) for the proposition that Plaintiff Laury's claim based upon the use of the restraint chair should fail because he has not alleged an injury resulting from the restraint chair.  Section 1997e(e) however does not apply where Plaintiff Laury is *not a convicted prisoner. See Abdul-Akbar v. McKelvie*, 239 F.3d 307 (3d Cir. 2001) ("The applicability of the personal injury requirement of 42 U.S.C. § 1997e(e) turns on the plaintiff's status as a prisoner, not at the time of the incident, but when the lawsuit is filed.") (citing *Harris v. Garner*, 216 F.3d 970, 974-75 (11th Cir. 2000)); *see also Scott v. Stone*, No. 03-75123, 2009 WL 1518948, at * 1 (E.D. Mich. June 1, 2009) (Steeh, J.) (relying on same).

[9] Alternatively, under the Fourteenth Amendment "[i]t is clear ... that the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment." *Graham*, 490 U.S. at 395 n. 10.  Indeed, the test for excessive force under the Fourteenth Amendment is whether the alleged conduct "shock[s] the conscience and [is] so brutal and offensive that its [does] not comport with traditional ideas of fair play and decency."  *County of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998).  Here, where Plaintiff Laury has wholly failed to analyze the Defendants' use of the restraint chair, cite to any law or facts or even attempt to articulate that a genuine issue of material fact exists on this record, the Court finds that Plaintiff Laury's claim would fail under the Fourteenth Amendment standard as well.

altercation between Plaintiff Laury and the Defendant officers after the jacket toss, stating that: "Defendants engaged in excessive force when they attacked him in the booking station." (Pl.'s Br. at 20). Moreover, while Plaintiff Laury noted the use of the restraint chair in the recitation of the facts of this action and generally asserted by bullet point that the use of the chair constituted excessive force in his briefing; Plaintiff Laury failed to analyze the use of the restraint chair under <u>any</u> constitutional standard, or cite to any case law or facts that could support such an argument in his briefing. (*See* Pl.'s Br. at 1, 8, noting the use of the restraint chair; *but see* Pl.'s Br. 12-23, failing to address, analyze or mention the use of the restraint chair in the substantive analysis of his claims). At oral argument, Plaintiff Laury merely asserted that he was "ultimately" placed in the restraint chair and that Defendant Price set the chain of events in motion by retaliating against Plaintiff Laury for complaining that his arrest was racially motivated. Plaintiff Laury's arguments are insufficient to create a genuine issue of material fact regarding whether the use of the restraint chair constituted excessive force. Indeed, it remains unclear from this record if Plaintiff Laury is claiming that the mere use of the chair constituted unreasonable force or if the manner in which he was secured in the chair gives rise to a claim of excessive force.

Federal Rule of Civil Procedure 56 clearly demands that a party asserting that a fact is genuinely disputed must support the assertion by "citing to particular parts of materials in the record, including deposition, documents... or other materials." FED. R. CIV. P. 56(c)(1). Moreover, the Sixth Circuit has held that once a moving party has identified an absence of a genuine dispute over material facts, "the party opposing the motion then may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th

21

Cir. 2009) (citation omitted).  In the instant case, Plaintiff Laury has failed to identify any case law, cite any facts, or make a particularized argument in support of his claims of excessive force based on Defendants' use of the restraint chair.  *See also Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, n. (6th Cir. 2013) (holding that "[t]his Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment." (collecting cases)).

Therefore, the Court finds summary judgment is appropriate on this claim.

4.    Failure to Intervene Claims: Defendants Huffman and Campbell

First, it is clear from the record of this case that Defendant Huffman had no interaction or contact with Plaintiff Laury after exiting the elevator at the Warren Police Station.  This undisputed record mandates summary judgment in favor of Defendant Huffman where he was not involved, in any way, with the actions that Plaintiff Laury alleges constitute excessive force.  *See Binay,* 601 F.3d at 650.

Defendants also mistakenly argue that Defendant Rodriguez was not involved in the altercation and the Court should grant summary judgment to him as to Plaintiff Laury's failure to intervene claims.  As noted previously, this argument is blatantly contradicted by the testimony and video evidence.  It is clear, however, that Defendants are attempting to argue that Plaintiff Laury cannot sustain a failure to intervene claim against Defendant Campbell.

Despite Defendants moving for summary judgment on Plaintiff Laury's failure to intervene claims, Plaintiff Laury failed to set forth any substantive argument in his briefing or through oral argument regarding the same.  Indeed, as the record stands Plaintiff Laury has failed to even cite to the video evidence to differentiate the conduct of any defendant officers regarding his failure to

22

intervene claims.  Rather than make any particularized argument, Plaintiff Laury merely stated that "Mr. Laury is not completely sure who participated in the attack, and who was just observing it." (Pl.'s Resp. at 23).  This statement is specious as it ignores the deposition testimony and the video evidence in the record that identifies each Defendant officers' actions.

As set forth previously, Rule 56 requires that a party asserting that a fact is genuinely disputed must support the assertion by "citing to particular parts of materials in the record, including deposition, documents... or other materials." FED. R. CIV. P. 56(c)(1).  Additionally, once a moving party has identified an absence of a genuine dispute over material facts, "the party opposing the motion then may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Alexander*, 576 F.3d at 558 (citation omitted).  In the instant case, Plaintiff Laury failed to articulate an argument in support of his claims of excessive force based on any of the Defendants failure to intervene.

Accordingly, where Plaintiff Laury has failed to make any specific argument or offer any support for that argument with facts or case law, the Court declines to make a claim on his behalf or go fish for such facts in the record.  According, the Court will grant summary judgment as to both Defendants Huffman and Campbell.

5.    Defendant Price's failure to loosen Plaintiff Laury's Handcuffs

Plaintiff Laury appears to assert an excessive force claim based on his handcuffs being applied too tightly by Defendant Price in his Response brief.  (Pl.'s Resp. at 1, 6).  Defendants argue that this claim should fail because Plaintiff failed to allege this claim in his Complaint.  The Court notes that the Complaint does state that Plaintiff Laury was restrained by handcuffs, but is void of

23

any allegation that those handcuffs were applied too tightly.  (ECF No. 1, Compl. at ¶¶ 16, 19).

The Sixth Circuit has stated that a "court's evaluation of the scope of [a plaintiff's] claims amounts to a decision of the sufficiency of a pleading" and a notice inquiry "necessarily proceeds on a case by case basis."  *Carter v. Ford Motor Co.*, 561 F.3d 562, 566, 568 (6th Cir. 2009); *see also Tucker v. Union of Needletrades, Industrial & Textile Employees*, 407 F.3d 784, 788 (6th Cir. 2005) (finding that a "non-moving party plaintiff may not raise a new legal claim for the first time in response to the opposing party's summary judgment motion" (citation omitted)).  The key issue in evaluating a challenge to the sufficiency of a pleading is the issue of notice.  *Carter*, 561 F.3d at 566 (finding that where the complaint was ambiguous, plaintiff's "attempt to revive or resurrect her 2005 claim at summary judgment was too little too late.").

In the present case, there is nothing indicating that the Defendants were aware that Plaintiff Laury was asserting an excessive force claim based on his handcuffs being applied too tightly prior to the filing of Plaintiff Laury's Response brief.  The Court also finds that there is no ambiguity that the Complaint is void of any such claim.  Significantly, the Court notes that Plaintiff Laury failed to move to amend his Complaint to include this claim after Plaintiff Laury's deposition was taken (wherein he testified that he complained his handcuffs were too tight), nor did Plaintiff Laury seek to amend his Complaint after submitting his Response brief that appears to set forth such a claim. Finally, Plaintiff Laury did not provide any argument on this claim during oral argument or request to amend his Complaint at that time.

For all these reasons, the Court finds that Plaintiff Laury has waived a "too tight" handcuffing claim in this action where Defendants did not have fair notice of this claim and Plaintiff Laury never requested to amend his Complaint.

6.     Denial of Medical Care

Defendants also argue that Plaintiff Laury has failed to state a claim regarding an alleged denial of medical care.  (Defs.' Reply at 5-7).  The Court notes that unlike his "too tight handcuffing" claim, Plaintiff's Complaint is more ambiguous regarding a potential denial of medical care claim. The Complaint provides "[t]hough injuries were readily visible to Kevin Laury's face, the defendants failed to provide or otherwise secure any medical care of treatment for Laury, this despite Kevin Laury's pleas for care."  (Compl. at ¶ 26).  This paragraph is incorporated under Plaintiff Laury's "Violation of U.S.C.A. 4 - Excessive Force Claim".  (*Id.* ¶ 27).  However, Plaintiff Laury does not reference deliberate indifference in his Complaint nor does he differentiate his denial of medical care claim from his excessive force claim in his Complaint.

More significantly, Plaintiff Laury fails to make any reference to a denial of medical care in his Response brief beyond generally recounting his version of events.  Specifically, Plaintiff Laury made clear in his Response brief that "[t]his case involves the Defendants' use of excessive force against Mr. Laury during the course of his arrest and detainment on April 25, 2013".  (Pl.'s Br. at 1).  Plaintiff Laury then set forth a bulleted list of the conduct that the Defendants allegedly engaged in that "amounted to excessive force" but does not include any mention of a denial of medical care in this enumerated list.  (Pl.'s Resp. at 1).  Additionally, Plaintiff Laury did not address or offer any argument on this issue during oral argument.

Given these facts, the Court finds that to the extent that Plaintiff Laury has attempted to set forth a claim based on a denial of medical care, such an attempt is rejected where Plaintiff Laury wholly failed to offer any reasonable argument or support of such a claim.  Accordingly, the Court grants summary judgment on this claim.

25

IV. CONCLUSION

For all these reasons the Court GRANTS Defendants' Motion for Summary Judgment (ECF No. 20).

IT IS SO ORDERED.


s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  May 20, 2015

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on May 20, 2015.


s/Deborah Tofil
Case Manager